No. 3–05–0420

Filed October 31, 2007.
IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Fourteenth Judicial Circuit, Henry County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04–CF–51 |
| ANDRES ROA, | ) ) | Honorable Larry S. Vandersnick, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE WRIGHT delivered the opinion of the court

Defendant Andres Roa appeals from his conviction for violation of section 401(a)(2)(A) of the Controlled Substances Act (720 ILCS 570/401(a)(2)(A) (West 2004)). On appeal, defendant raises the single issue of whether the trial court improperly denied his motion to suppress evidence seized during a consensual search of defendant's vehicle. We affirm.

BACKGROUND

Defendant was operating a vehicle he recently purchased when an Illinois state trooper stopped him for speeding at 71 miles per hour in a posted 65 mile per hour zone on Interstate 80 in Henry County, Illinois. The officer, Sergeant Floyd Blanks, is a certified drug interdiction instructor and the drug interdiction coordinator for his district. He has been employed by the

State Police for 17 years.

According to the officer, after stopping defendant for speeding, he approached the car, advised defendant he was going to issue a written warning for speeding, and asked for defendant's license and registration. Blanks stated that defendant fumbled for those documents, seemed "to exhibit more physical stress than most people do," and mumbled while staring straight ahead. Blanks immediately advised defendant he was going to issue a written warning. At some point during the traffic stop, Blanks asked defendant where he was traveling from and where he was going. Defendant told Blanks that he was traveling from Colorado to New York.

Blanks said defendant seemed "to exhibit more physical stress than most people do, along with a couple of other factors." Despite being informed that he was going to receive a warning, defendant remained nervous and, "in this case, that's why I [Blanks] requested consent to search the vehicle." Blanks also noticed a new air freshener and a strong odor of air freshener emanating from the car, which piqued Blanks' suspicion.

According to Blanks, when he returned to his squad car to write a warning ticket, he knew, "with [defendant's] nervousness, the odor of air freshener, ***[he] was going to try to obtain permission to search that vehicle." Blanks testified, "I knew from my training and experience that something was amiss, something was wrong, so I asked requested assistance from Trooper Clint Thulen."

Blanks did issue a written warning for the speeding violation. Once he delivered the written warning citation, Blanks returned defendant's license, registration and insurance card. According to defendant, as the officer started to return to his squad car, the officer said, "Wait a minute, Andres," and then asked defendant for permission to conduct a search of defendant's

2

car. Defendant consented.

According to Blanks, the conversation with defendant before asking for consent was slightly longer. The officer recounted that, after issuing a written warning and returning defendant's license and insurance card, he asked defendant if everything in the vehicle belonged to him and whether anyone had asked defendant to transport anything. Defendant responded that everything in the vehicle belonged to him and no one had asked him to transport anything. Blanks then asked if there was anything illegal in the vehicle, including any alcohol, weapons, or drugs. The defendant replied, "no." Blanks then asked if he could search the vehicle. Defendant's response was, "yes." According to Blanks, if defendant refused permission to search his car, Blanks would have allowed him to drive away.

After obtaining consent, Blanks asked defendant what was in the trunk. Defendant answered, "antiques," and offered to show him an antique dealer's card. At Blanks' request, defendant opened the trunk and found it was empty. Blanks felt this was unusual since defendant had just told him there were antiques in the trunk.

As requested, Trooper Thulen arrived on the scene during the initial moments of the search, while Blanks was standing near the trunk of defendant's car. Together, the officers then proceeded to the front of the vehicle. Blanks noticed that the air bag area appeared to have been tampered with or modified. After a 20-minute search, which included using a fiberoptic scope, the officers discovered a hidden compartment containing cocaine. Later, when the compartment was disassembled, the troopers found the compartment contained a total of 24.2 pounds of cocaine. The cocaine was packaged in 11 separate packages.

Initially, defendant faced three charges based on this evidence. Count I alleged defendant

3

knowingly brought more than 900 grams of cocaine into the State of Illinois with the intent to deliver in violation of section 401.1(a) of the Controlled Substances Act (Act) (720 ILCS 570/401.1(a) (West 2004)). Count II alleged defendant knowingly possessed with the intent to deliver more than 15 but less than 100 grams of cocaine in violation of section 401(a)(2)(A) of the Act (720 ILCS 570/401(a)(2)(A) (West 2004)). Finally, count III alleged that defendant possessed more than 900 grams of cocaine in violation of section 402(a)(2)(D) of the Act (720 ILCS 570/402(a)(2)(D) (West 2004)).

Prior to trial, defense counsel filed a motion to suppress the cocaine, alleging the police expanded a traffic stop into a drug investigation without probable cause. During the hearing on the motion, the trial court heard testimony from Sergeant Blanks regarding factors he considers when looking for drug-related activities. According to Blanks, ongoing nervousness is only one of many factors indicating illegal activity. Blanks explained to the court:

"There are a number of things that we are trained to observe, such as third-party vehicles, vehicles rented by someone else, the odor of air freshener and masking agents in the vehicle, a vehicle that looks lived in, a vehicle with numerous energy drinks or coffee cups showing they've been driving all night, cigarettes and nervousness, and I could go on and on, sir."

Trooper Clint Thulen also testified at the suppression hearing. Thulen testified that he has been employed by the State Police for 14 years as a patrol officer and currently as a canine handler. When Thulen arrived on the scene of the stop, Blanks was searching defendant's trunk. According to Thulen, defendant appeared unusually nervous and exhibited signs of stress. Defendant seemed unusually uncomfortable, "out of sorts," and avoided eye contact.

4

Following the testimony of defendant, Sergeant Blanks, Trooper Thulen, and arguments of counsel, the trial court denied the motion to suppress, finding Sergeant Blanks' search was properly based on three grounds. First, the court noted Sergeant Blanks had probable cause for the initial traffic stop based on speeding. Second, the court found the duration of the traffic stop was reasonable because Sergeant Blanks did not delay asking for consent to search. Finally, the judge concluded, based on the totality of the circumstances, Sergeant Blanks had a reasonable, articulable suspicion that defendant was engaged in criminal conduct.

Applying a totality-of-the-circumstances approach, the court considered the officer's description of the circumstances the officer encountered. Relevant factors included defendant's extreme nervousness, mumbling, fumbling, straightforward gaze, and abnormal physical stress, and a new air freshener that piqued the officer's curiosity and suspicion. The court heavily weighed Sergeant Blanks' vast experience in drug interdiction, finding Sergeant Blanks' training would give a person in his position a reasonable, articulable suspicion that there was some kind of criminal activity afoot. Accordingly, the trial court denied defendant's motion to suppress evidence.

Defendant's first jury trial resulted in a deadlocked jury. Subsequently, the State dismissed counts I and III of the information and, following a stipulated bench trial on count II only, the trial judge found defendant guilty of unlawful possession with intent to deliver more than 15 grams but not more than 100 grams of a controlled substance, in violation of section 401(a)(2)(A) (720 ILCS 570/401(a)(2)(A) (West 2004)). The court sentenced defendant to 15 years' imprisonment. Following the denial of his posttrial motions, defendant timely appealed on the ground that his motion to suppress should have been granted.

5

ANALYSIS

Defendant contends Sergeant Blanks' request for consent to search, and the resulting search of his vehicle, exceeded the scope of the circumstances justifying the traffic stop, negating defendant's consent. Defendant claims the officer illegally expanded the traffic stop into a drug investigation.

The State argues the consensual nature of the search alone justifies the trial court's denial of the motion to suppress. The State asserts the request for consent was well within the strictures of the fourth amendment of the United States Constitution, based on the totality of the circumstances in this case .

The fourth amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Similarly, article I, section 6, of the Illinois Constitution of 1970 guarantees that "people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, [and] seizures." Ill. Const. 1970, art. I, §6. The Illinois Supreme Court has construed the search and seizure language found in section 6 of our state constitution in a manner consistent with the United States Supreme Court's fourth amendment jurisprudence. *People v. Caballes*, 221 Ill. 2d 282, 314 (2006).

Both the United States Supreme Court and our Illinois Supreme Court have provided some limited guidance for drug interdiction vehicle stops. However,  the status of this area of the law is quickly evolving. Based on a review of existing precedent, we hold that the trial court properly denied defendant's motion to suppress.

The law of search and seizure is based upon the strongest foundational requirements of

6

our constitutional footings. The forefathers of our federal constitution could not have foreseen the possibility of interstate highways becoming an efficient passageway for illegal drug trade. Sadly, those who transport the drugs are often recruits or "mules," far removed from the drug dealers who profit from a commodity they refuse to transport. Drug interdiction operations remove contraband from the chain of commerce. Nevertheless, courts have a duty to ensure drug interdiction efforts do not overshadow the protections afforded by our federal and state constitutions.

Generally, the review of a trial court's ruling on a motion to suppress presents mixed questions of law and fact (*People v. Gherna*, 203 Ill. 2d 165, 175 (2003)), and a two-part standard of review is applicable (*People v. Luedemann*, 222 Ill. 2d 530, 542 (2006)). The reviewing court first examines whether the trial court's factual findings are against the manifest weight of the evidence. *Luedemann*, 222 Ill. 2d at 542. Second, the court must determine *de novo* whether the trial court properly applied the law to the facts.

As to the first prong, defendant states in his brief that he is not challenging the trial court's factual findings and credibility determinations concerning Sergeant Blank's justification for the traffic stop. Additionally, defendant does not challenge the voluntariness of his consent to search. The State concedes the traffic stop had ended prior to the request to search. Consequently, this case presents only a question of law, not fact. Accordingly, we review *de novo* the trial court's ultimate legal determination that the request for consent to search the vehicle after the traffic stop ended was constitutionally justified.

Under the law, the United States Supreme Court has recognized "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it

7

is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 160 L. Ed. 2d. 842, 846, 125 S. Ct. 834, 837 (2005). There are three tiers of lawful police-civilian encounters: (1) arrests supported by probable cause; (2) brief investigatory detentions, justified by a reasonable, articulable suspicion of criminal activity (*Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)); and (3) consensual encounters involving no coercion or detentions that do not implicate fourth amendment interests. *Luedemann,* 222 Ill. 2d at 544.

The parties here agree the initial traffic stop fell squarely within the first level of lawful intrusions because this traffic stop was based upon probable cause to believe defendant was speeding. However, defendant relies on our supreme court's decision in *People v. Gonzalez*, 204 Ill. 2d 220 (2003), to challenge the officer's request for consent to search, as beyond the scope of the stop and without a reasonable, articulable basis. Defendant argues the request for consent went far beyond the scope of the circumstances justifying the traffic stop under either *Terry* or *Gonzalez*.

The State asserts that, according to another recent decision by our supreme court in *People v. Brownlee*, 186 Ill. 2d 501 (1999), both the defendant's detention and the officer's request for consent to search were permissible. Alternatively, the State argues that *Gonzalez* is no longer good law. Since the parties do not agree whether *Gonzalez* or *Brownlee* applies to the facts of this case, a brief review of the Illinois Supreme Court's holdings in those cases may be helpful.

In *Brownlee*, two officers stopped a vehicle for a minor traffic violation. The officers approached the car from each side and obtained the identities of the four young occupants. After

returning the driver's license and insurance card, one of the officers explained that no citations would be issued. The officer then "paused, a couple [of] minutes," and asked the driver if he could search the vehicle. The driver reluctantly consented. The officers not only searched the car, but also searched the occupants of the vehicle. The officers discovered the defendant, a young female passenger, possessed a controlled substance. On appeal, our supreme court acknowledged that an officer is always free to request permission to search. *Brownlee*, 186 Ill. 2d at 515, citing *Ohio v. Robinette*, 519 U.S. 33, 136 L. Ed. 2d 347, 117 S. Ct. 417 (1996). The court stated:

> "The problem in this case was not that the officers requested permission to search the car. It was that the officers unconstitutionally detained the car and its occupants *before* requesting permission to search the car, and after the conclusion of the traffic stop." (Emphasis in original.) *Brownlee*, 186 Ill. 2d at 515.

The court agreed with the circuit court below, finding that the pausing for "a couple [of] minutes" by the police constituted a sufficient show of authority leading the defendant, a reasonable person, to conclude that she was not free to leave. The court concluded the driver and the passengers were, therefore, subjected to a second seizure. *Brownlee*, 186 Ill. 2d at 520.

The court then applied a *Terry* analysis and held the second seizure was illegal since the State made no showing that the officers' second detention of the car was reasonable or sufficiently limited in scope and duration. *Brownlee*, 186 Ill. 2d at 521. Consequently, our supreme court held that the illegal detention tainted the driver's subsequent consent to search the vehicle, as well as the passenger-defendant's subsequent arrest. *Brownlee*, 186 Ill. 2d at 521.

In *Gonzalez*, the officer asked the defendant, a passenger, for identification. The ensuing

9

encounter between the officer and the passenger resulted in a search which revealed a packet of cocaine on his person. Both the trial court and the appellate court concluded the officer's request for Gonzalez's identification was unreasonable, warranting suppression of the evidence.

On review, the supreme court held that, "even if only for a brief period and for a limited purpose," a traffic stop is a "seizure." *Gonzalez*, 204 Ill. 2d at 225. The court stated that, "[b]ecause a vehicle stop constitutes a seizure of the vehicle's occupants, a vehicle stop is subject to the fourth amendment's requirement of reasonableness." *Gonzalez*, 204 Ill. 2d at 226, citing *Whren v. United States*, 517 U.S. 806, 809-10, 135 L. Ed. 2d 89, 95, 116 S. Ct. 1769, 1772 (1996). The court determined that the vehicle stop was "justified at its inception" because it was supported by probable cause. *Gonzalez*, 204 Ill. 2d at 228-29. The court then set forth the test to determine whether police questioning *during* a traffic stop satisfies the "scope" requirement. The court stated, "[W]e must consider whether, in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop." *Gonzalez*, 204 Ill. 2d at 235. The court reasoned:

> "A simple request for identification is facially innocuous. It does not suggest official interrogation and is not the type of question or request that would increase the confrontational nature of the encounter. We note, too, that defendant was under no obligation to answer or comply." *Gonzalez*, 204 Ill. 2d at 236.

Consequently, the court reversed the appellate court's judgment, which had affirmed the trial court's decision granting the defendant's motion to quash arrest and suppress evidence. *Gonzalez*, 204 Ill. 2d at 237.

In this case, the State concedes that the traffic stop for speeding ended with the delivery

of the written warning citation. Therefore, since the police questioning occurred *after* the lawful traffic stop ended, the officer's conduct must be examined under the mandates of *Brownlee* to determine whether Officer Blanks' questions and request for consent to search constituted an additional seizure. Unfortunately, here, the trial court overlooked *Brownlee,* finding that since the officer did not delay before asking the questions, "it isn't a *Brownlee* situation." The trial court should have first examined the facts under *Brownlee* to determine whether the additional questioning constituted a second seizure.

The United States Supreme Court has provided guidance for determining whether a detention constitutes a seizure in *United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980). In *Mendenhall*, the Supreme Court held that "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall,* 446 U.S. at 545, 64 L. Ed. 2d at 497, 100 S. Ct. at 1870. *Mendenhall* listed four examples of circumstances that may indicate a seizure: (1) a threatening presence of several officers, (2) the display of an officer's weapon, (3) physical touching of the civilian by the officer; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *People v. Murray*, 137 Ill. 2d 382, 390 (1990), citing *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

Recently, in *Luedemann*, our supreme court discussed and refined these considerations in the context of a situation involving a parked vehicle, which had not been pulled over by police. In *Luedemann*, the court applies a "free to ignore" test to support the conclusion that the nature of the encounter between the occupant of the stationary vehicle and officer was also consensual.

11

*Luedemann*, 222 Ill. 2d at 564-65. The "free to ignore" test is similar to the *Gonzalez* "under no obligation to answer or comply" test.

Examining the facts of this case with all these considerations in mind, Justice McDade and I agree the conversation between defendant and Sergeant Blanks following the issuance of the written warning, constituted a second seizure based on the facts of this case. We agree that defendant, a man of foreign-born descent, confronted with the progressive nature of each question, would not have felt free to leave before the officer ended the conversation.

Here, the officer continued the exchange, following each response by defendant with further, albeit abbreviated, conversation, requiring defendant to reply or be judged for his failure to respond. Defendant was not free to ignore the questions. Although there was no threatening presence of officers, display of weapons, or use of physical force, a reasonable motorist would not believe he or she was free to depart, or decline the officer's inquiries, until given clear communication from the officer that the encounter was over.

This determination is supported by other appellate court decisions concluding that a reasonable motorist would not believe he or she was free to disregard an officer's questioning following the conclusion of a legal traffic stop and depart. See, *e.g.*, *People v. Goeking*, 335 Ill. App. 3d 321, 324 (2002) (observing that "[i]t is difficult to imagine many cases when a motorist would voluntarily remain at the scene of a traffic stop to engage the officer in casual conversation"). Similarly, this court has previously found that a reasonable motorist would not feel free to leave or ignore the officer's request following the conclusion of a lawful traffic stop when the officer "injected his request for consent [to search the vehicle] into the seamless transition between mandatory and 'consensual' interaction." *People v. LaPoint*, 353 Ill. App. 3d

12

328, 333 (2004).

Consequently, it must be determined whether Sergeant Blanks had a reasonable, articulable suspicion to justify the second *Terry* stop, which culminated in a request for consent to search defendant's vehicle. I believe the articulable suspicion formulated during the traffic stop survives and is not extinguished by issuing a traffic citation.

It seems clear the officer provided the trial judge with an articulable basis for his request to search based on observations gathered during the traffic encounter. Applying *Terry* to the *trial court's* factual determinations, the officer's decision to request consent to search was constitutionally justified.

The *Terry* decision has been applied under so many circumstances it is often overlooked that the suspicious actions in *Terry* were the innocent activities of strolling up and down the street and peering into store windows in broad daylight. This innocent behavior piqued an officer's suspicion and he briefly detained the men and then found a concealed weapon.

In this case, Sergeant Blanks explained to the judge that defendant's behavior, his fumbling through the glove box, dropping items, and failing to locate the insurance card, aroused his, Blanks', suspicions. Blanks explained that defendant exhibited "more physical stress than most people" in mumbling with a low volume and casting long, averted gazes. Blanks testified that his suspicion was "piqued" because he could see and smell a newer air freshener. The officer found it unusual, based of his training and experience, that defendant's stress and nervousness persisted once a written warning was promised. Nothing occurred during the stop to negate this reasonable suspicion.

Justice McDade's thoughtfully written dissent raises valid concerns shared by our

supreme court regarding drug interdiction and traffic stops. The Illinois Supreme Court has held that the smell of air freshener alone is insufficient to support a reasonable suspicion because, "[w]hile air fresheners may be used to mask the odor of contraband, air fresheners are also used in cars to mask other odors such as cigarette smoke." *People v. Caballes*, 207 Ill. 2d 504, 510 (2003), <u>overruled on other grounds</u>, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005). Also, nervousness, without more, is an insufficient basis for detaining a defendant. *Caballes*, 207 Ill. 2d at 510.

However, we may not substitute our evaluation of the facts for that of the trial judge. The trial court did not look to these two factors in isolation. Rather, the trial court found Sergeant Blanks had a reasonable, articulable suspicion based on a totality of the circumstances. Those circumstances included defendant exhibiting an unusual level of stress during the traffic stop, which did not subside even after defendant learned he was only being issued a warning ticket. That unusual level of stress, combined with Blanks' observation of a new air freshener, and taking into account Sergeant Blanks' vast training and experience in drug interdiction, was sufficient to provide Blanks with a reasonable, articulable suspicion that criminal activity was afoot. The court reasoned:

> " I have to look at it as an officer with Trooper Blanks' experience would look at it. ***
> [Blanks] has 17 years of experience or more. It's not like *** somebody that is a rookie
> that just came on. And I have to look at that. That's the totality of the circumstances. I
> have a trooper here that has been - has significant training, and I'm well aware [Blanks]
> has been in court many, many times in these situations, and obviously from his testimony
> here, [Blanks] knows what he's doing. He can describe the - the scent of - of cocaine. He

14

can describe masking agents and *** he's very well versed in - in cocaine trafficking or in controlled substance trafficking."

The United States Supreme Court has specifically sanctioned the totality-of-the-circumstances approach employed by the trial court in this case. In *United States v. Arvizu*, 534 U.S. 266, 274, 151 L. Ed. 2d 740, 750, 122 S. Ct. 744, 751 (2002), the Court specifically criticized the "sort of divide-and-conquer analysis" that examines each of the officer's observations independently for a reasonable explanation, finding this analysis is a sharp departure from the totality-of-the-circumstances approach. *Arvizu*, 534 U.S. at 274, 151 L. Ed. 2d at 750, 122 S. Ct. at 751. The Court explained that the totality-of-the-circumstances approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *Arvizu*, 534 U.S. at 273, 151 L. Ed. 2d at 749-50, 122 S. Ct. at 750-51, quoting *United States v. Cortez*, 449 U.S. 411, 418, 66 L. Ed. 2d 621, 629, 101 S. Ct. 690, 695 (1981). The inquiry for the trial court was whether this officer, not just any officer, had a reasonable, articulable suspicion for the second seizure. See *Arvizu*, 534 U.S. at 273, 151 L. Ed. 2d at 749-50, 122 S. Ct. at 750-51 quoting *Cortez*, 449 U.S. at 418, 66 L. Ed. 2d at 629, 101 S. Ct. at 695.

The trial court considered Sergeant Blanks' testimony and carefully pointed out many factors that supported finding a reasonable articulable suspicion based on a totality-of-the-circumstances analysis. Drug couriers do not intentionally post clues or travel the interstate with destination and purpose signs displayed like Greyhound buses. Instead, drug couriers deliberately camouflage their illegal conduct in the guise of innocent activities to avoid

15

apprehension. Meaningless minutiae that might go unnoticed by most civilians become the focus of a trained drug interdiction officer, leading to justification for further action. This is the benefit of police training and experience. An examination of such factors in isolation departs from the totality-of-the-circumstances approach, as stated by the Supreme Court in *Arvizu*, 534 U.S. at 274, 151 L. Ed. 2d at 750, 122 S. Ct. at 751. Here, based on a totality of the circumstances as found by the trial judge, the trial court's finding of an articulable basis for the request to search is not against the manifest weight of the evidence and must stand.

However, the finding of an articulable basis does not end the inquiry. The analysis must proceed to determine if the four questions posed by Sergeant Blanks in this case converted the *Terry* stop into an illegal seizure. The record shows Blanks did not immediately ask for consent to search the vehicle. Rather, he posed several questions, each one serving as a building block for the next, logically progressing so that the last question could be asked in such a manner to make an affirmative answer more likely, if not inevitable. The first three questions the officer posed were short, succinct, and formulated to produce "yes" or "no" responses, which did not unduly delay the fourth and final question regarding consent to search. These brief inquiries are similar to the nature of questions asked by the officer in *Terry* and did not unfairly convert this brief investigative stop into an unconstitutional seizure of defendant or his vehicle.

As noted in the dissent, Blanks admitted that in approximately 3,000 traffic situations, his assessment of articulable factors of drug activity lead to the discovery of contraband in only 1,000 cases. While disconcerting and entirely relevant for the court's consideration, Blanks' admitted fallibility is only one factor the trial judge could consider. It was the trial judge's obligation to determine the significance of this information.

16

It is well established a court may not consider the productive results of a completed search to bootstrap a finding of an articulable suspicion simply because the officer's hunch was correct. However, a court would be equally in error were it to reject a search based on a reasonable, articulable suspicion of criminal activity merely because the officer had not found contraband in other, unrelated searches. Here, the court heard evidence that Blanks did not always discover contraband based on his suspicions. However, each case must be judged on its own unique facts. In this case, the trial judge properly determined that the search passed constitutional muster.

In his special concurring opinion, Presiding Justice Lytton concludes that the police-citizen encounter in this case qualifies as a third-tier "consensual encounter" under *Luedemann*, 222 Ill. 2d 530. We reach the same destination in our analysis, finding defendant's consent to search was both valid and constitutionally correct, based on separate paths when scrutinizing the three types of lawful encounters under *Terry*. While we may disagree as to whether the encounter constituted a second seizure or a consensual encounter, Presiding Justice Lytton and I both agree, based on separate legal grounds, that Blanks' request for consent to search was constitutionally permissible under the fourth amendment. The request for consent was lawful, and defendant concedes his consent was voluntary.

While defendant admits his consent was voluntary, he argues that his consent to search was limited in scope. Sergeant Blanks testified defendant consented to his search of the entire vehicle. In contrast, defendant testified that Blanks only asked to search the trunk. However, it is undisputed defendant did not stop the officers from searching his car beyond the trunk.

The conflict in the testimony required the trial court to make a credibility determination.

17

Matters of credibility are for the trial court to decide. This court should not rule on such matters because the trial court was in a position to observe the witnesses, assess their demeanor, and make credibility judgments based on a firsthand encounter with the witnesses. *People v. Hornsby*, 277 Ill. App. 3d 227, 230-31 (1995). Here, the record sustains the trial court's finding that Blanks was a credible witness.

Sergeant Blanks' consensual search was both productive and constitutional. Blanks' discovery that the trunk did not contain antiques, as defendant indicated, added to his suspicion of criminal activity and justified further investigation. The investigation led to observations of a hidden compartment in the engine, which raised still more reasonable suspicion. Using a small probe, the officers ultimately discovered more than 24 pounds of cocaine sophisticatedly hidden in an automobile both operated and owned by defendant on the date of the traffic stop.

CONCLUSION

We hold the trial court properly determined Sergeant Blanks' questioning and request for consent to search defendant's vehicle following the conclusion of a legal traffic stop was lawful. We therefore affirm the order of the circuit court of Henry County denying defendant's motion to suppress evidence.

Affirmed.

PRESIDING JUSTICE LYTTON specially concurs,

I agree with Justice Wright that the trial court's order denying defendant's motion to suppress should be affirmed. I write separately because, under the facts presented, I analyze this case as a lawful, consent-based search, not as a second seizure requiring constitutional consideration.

Courts have divided police-citizen encounters into three tiers: (1) arrests, which require probable cause; (2) "Terry stops," which must be supported by reasonable, articulable suspicion of criminal activity; and (3) consensual encounters which do not involve coercion or detention and do not implicate the fourth amendment. Luedemann, 222 Ill. 2d 530. Until our supreme court states otherwise, we are still obligated to initially assess the consensual nature of a police-citizen encounter. Justice Wright's analysis disregards that tier.

Sergeant Blanks returned to defendant's vehicle, handed him his documents and issued a written warning. At that point, the traffic stop drew to its conclusion and a second police-citizen encounter was initiated. Blanks immediately and lawfully asked defendant if he was transporting anything illegal. See Luedemann, 222 Ill. 2d at 552 (even when officers have no basis for suspicion of criminal activity, they may generally ask questions of an individual). He then requested and received consent to search defendant's vehicle. Defendant has not asserted that his consent to search was involuntary. There was no delay of a few minutes, no threat or command, and no brandishing of a weapon. From the record, it does not appear that Sergeant Blanks restrained defendant through physical force or exhibited his authority in an intimidating manner. He immediately asked defendant for consent to search the vehicle, and defendant voluntarily gave it.

Justice Wright notes the lack of physical force or show of authority, yet concludes that a second seizure occurred because the officer's questions "required defendant to reply," and defendant did not feel "free to depart" following the conclusion of the lawful stop.

However, in Brownlee, our supreme court noted that "an officer is always free to request permission to search." Brownlee, 186 Ill. 2d at 515. The issue in Brownlee was not that the

19

officers requested permission to search the vehicle after the conclusion of a lawful traffic stop, but that the two officers, one at the driver's side window and one at the passenger's side window, detained the car and its occupants for a few minutes without moving from their positions before requesting permission to search the vehicle. Brownlee, 186 Ill. 2d at 515. Those facts are not present here.

Moreover, the "feel free to leave" test is no longer the correct standard in cases involving independent restraint by a vehicle. The Illinois supreme court recently redefined the Mendenhall test in People v. Luedemann, 222 Ill. 2d 530 (2006). In that case, the court stated:

"Although 'free to leave' is the correct test for certain situations, it was not applicable here. In Bostick, [Florida v. Bostick, 501 U.S. 429 (1991)](citation omitted) the Supreme Court explained that the 'free to leave' language makes sense when the person is walking down a street or through an airport lobby. However, in situations in which the person's freedom of movement is restrained by some factor independent of police conduct the 'free to leave' test is inapplicable and 'the appropriate inquiry is whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter.' Bostick, 501 U.S. at 436" Luedemann, 222 Ill. 2d at 550.

In Luedemann, the defendant was approached by officers while seated in a parked car that was still running.

Here, defendant was seated in his car at the conclusion of a valid traffic stop. The appropriate analysis is whether a reasonable person in defendant's position would have believed he was free to decline Sergeant Blanks requests or otherwise terminate the encounter. This test

20

presupposes a reasonable, innocent person.  Luedemann, 222 Ill. 2d at 551; see also Bostick, 501 U.S. at 438.  The test requires "an objective evaluation of the police conduct in question and does not hinge upon the subjective perception of the person involved."  Luedemann, 222 Ill. 2d at 551.  The encounter becomes a seizure if the officer restrains the liberty of the vehicle's occupant through physical force or a show of authority.  See Bostick, 501 U.S. at 434.

Our supreme court's decision in Luedemann mandates an objective review of the officer's conduct to determine if a second seizure occurred.  Applying the facts in this case to the required analysis, I would conclude that the encounter that ensued at the conclusion of the lawful traffic stop was consensual and thus did not invoke fourth amendment concerns.

JUSTICE McDADE, dissenting:

The majority affirms the drug conviction of Andres Roa, rejecting his challenge to the denial of his motion to suppress evidence.  For the reasons that follow, I dissent from that decision.

I have no quarrel with the author's thorough and scholarly review of the law relevant to searches during or following traffic stops.  I completely agree that there was a second seizure that has to be constitutionally justified.  Nor do I have any disagreement with the law relied upon by the special concurrence.  I do, however, have significant problems with the majority's application of the law on which they rely to the facts of this case as developed at the hearing on the motion to suppress and at trial.

The issue in this case is the propriety of the search of defendant's car.  There are three questions to be addressed in resolving that issue.  First, did the officer have probable cause to expand the scope of the stop from a simple traffic offense to a drug investigation?  Second, did

21

defendant give consent to search and, if so, what was the extent of the consent? Third, if he gave consent to search "the vehicle" rather than only "the trunk," did the level of intrusiveness exceed a reasonable expectation of the scope of the consent?

Factually, although defendant contends that he was not speeding, it is nonetheless undisputed that Roa was driving, apparently alone, on Interstate 80 in February 2004 and that he was stopped by Sergeant Floyd Blanks who testified that, according to radar, defendant was exceeding the speed limit by 6 miles per hour. It is also undisputed that Roa produced his driver's license, vehicle registration, and proof of insurance. Nothing in the record indicates that this was a rental car or that defendant was otherwise not its owner. It is further undisputed that after checking defendant's documents, Blanks issued him a written warning and returned the documents, presumably freeing him to leave. However, the officer then stopped him, asked several questions and then requested permission to search something – Roa says it was only the trunk and Blanks says the vehicle.

I. Was the Search of Roa's Vehicle Constitutionally Justified?

The first question is what factors Blanks believed gave him reasonable, articulable suspicion necessary to effect a second seizure of Roa and to search his car.

Before looking at the second seizure, however, I would like to briefly address the first seizure. I suggest that Sergeant Blanks did not stop Andres Roa for driving six miles over the speed limit because he wanted to keep the highway safe for other motorists. The fact is that he is a drug interdiction officer and as such he cruises the interstate trolling for drug offenders. I would further suggest that he stopped Roa because he had decided he was such an offender and the minor speeding was nothing more than subterfuge from the outset. I believe this conclusion

22

is implicit in and can be reasonably inferred from the totality of Sergeant Blanks' testimony.

I mention this conclusion not because it casts any doubt on the validity of the original traffic stop -- technically even one mile per hour over the speed limit constitutes the requisite probable cause. It could, however, have a direct bearing on the second seizure. The high courts of our state and country have directed that when we assess whether an officer has a reasonable, articulable suspicion justifying a search, we must consider the "totality of the circumstances." The majority has set out in its decision some of the cases that so instruct. Indeed, the majority has emphasized that the totality of the circumstances is the basis for its decision to affirm the trial court's denial of Roa's motion to suppress.

It is surely a major part of the totality of the circumstances if the officer effecting the traffic stop is not observing the defendant in an objective manner while completing the stop and simply happens to see, hear or smell something that moves him from neutrality or objectivity to suspicion. Quite to the contrary. He is viewing the defendant and the vehicle with the purpose of finding an excuse to search and of vindicating his original belief that the driver is a drug courier. With that mindset, the officer searches for any excuse to extend the seizure and effect a search.

I believe the framers of our constitution, while they were unaware of the war on drugs, were very familiar with the psychology of preconceptions and bias and that it was this awareness that led them to require a warrant, *issued by a neutral magistrate*, before government officers could proceed to search or to seize. The wisdom of that protection can be seen in this case and cases like it. For an officer already convinced that he is dealing with a drug courier, objectively innocent behavior morphs into indicators of criminal behavior: nervousness and fumbling can

23

easily become "extreme" or "excessive," a simple air freshener becomes a masking agent and magically provides reasonable articulable suspicion of drug dealing. In his testimony, Sergeant Blanks described these and other perfectly innocent factors that have been given a sinister patina to justify drug searches.

He testified that he has seventeen years of experience, that he is a certified drug interdiction instructor, and that he teaches team members -- as he himself was taught -- to look for certain indicators of criminal activity:

"There are a number of things that we are trained to observe, such as third-party vehicles, vehicles rented by someone else, the odor of air freshener and masking agents in the vehicle, a vehicle that looks lived in, a vehicle with numerous energy drinks or coffee cups, showing they've been driving all night, cigarettes and nervousness, and I could go on and on, sir."

At another point in his testimony, he amplified on the indicators of nervousness (mumbling, fumbling, physical signs of stress) and indicated that he believed the presence of any *one* of the factors would be sufficient to excite suspicion and justify a search.

With specific reference to Roa, his testimony was: "with [defendant's] nervousness, the odor of air freshener, I knew I was going to try to obtain permission to search that vehicle. I knew from my training and experience that something was amiss, something was wrong..." Sergeant Blanks reiterated those two bases for searching Roa's car at other times during his testimony.

Plainly, the trial court accepted the officer's explanations and assurances without critical

24

thought.  Here I quote from the majority opinion:

"The trial court did not look to these two factors in isolation. Rather, the trial court found Sergeant Blanks had a reasonable, articulable suspicion based on a totality of the circumstances. Those circumstances included defendant exhibiting an unusual level of stress during the traffic stop, which did not subside even after defendant learned he was only being issued a warning ticket. That unusual level of stress, combined with Blanks' observation of a new air freshener, and taking into account Sergeant Blanks' vast training and experience in drug interdiction, was sufficient to provide Blanks with a reasonable, articulable suspicion that criminal activity was afoot.   The court reasoned:

'I have to look at it as an officer with Trooper Blanks' experience would look at it *** he has 17 years of experience or more.  It's not like Officer Thulen or somebody that is a rookie that just came on.  And I have to look at that. *That's the totality of the circumstances.*  I have a trooper here that has been – has significant training, and I'm well aware he has been in court many, many times in these situations, and obviously from his testimony here, he knows what he's doing.  He can describe the –

25

the scent of – of cocaine. He can describe masking agents and *** he's very well versed in – in cocaine trafficking or in controlled substance trafficking.'"

(Emphasis added.) Slip op. at 14.

While fully cognizant of the United States Supreme Court's criticism that examination of the individual factors relied upon by police officers is inconsistent with a totality-of-the-circumstances analysis *(United States v. Arvizu,* 534 U.S. 255, 274, 151 L. Ed. 2d 740, 122 S.Ct. 744, 751 (2002)), I would still like to start by looking at the validity (or lack thereof) of the factors identified by Sergeant Blanks, any one of which would, he asserts, lead him to search.

<u>     Third party vehicles, whether rented/borrowed by the driver, or rented/owned by someone else.</u> This would appear to include every vehicle on the roads that is not actually owned by the person driving it. There are millions of such vehicles being driven on the highways and byways of this country every year. Apparently those driving them or any borrowed car are at risk, once having been stopped, of being searched by drug interdiction officers (or the police generally) because of the vehicle they are driving.

<u>The odor of air freshener and masking agents in the car.</u> There are surely as many legitimate reasons for using air freshener in your car as there are drivers. And, if you are a routine user of them, it is inevitable that you will have a new, strongly-scented one from time to time. Many car wash services spray or hang air freshener as a routine part of the cleaning package. Some car lovers just want their cars to smell special. Others may want to cover the odors of, just to suggest a few, gym shoes, cat urine, baby spit-up, spilled milk, something unpleasant stepped in by accident, cheap gasoline. All of these purposes, whether practical or

26

self-indulgent, could, according to Blanks, subject the driver, without anything more, to a search of their vehicles.

A vehicle that looks lived in.  There are many people who, despite being otherwise neat and orderly, keep junky cars.  A random search of vehicles could disclose clothing and footwear, outerwear, umbrellas, blankets, pillows, tools, books and multiple forms of electronic entertainment, exercise equipment, pet needs, auto maintenance and cleaning supplies, kleenex, drinks and food – and absolutely no drugs.  But the vehicles would, in three words, look lived in.

A vehicle with numerous energy drinks or coffee cups, showing they've been driving all night.  Thousands (perhaps tens or hundreds of thousands) of trip-takers, including commuters and vacationers, plan their trips strategically to avoid hitting urban areas or known construction zones during rush times, or in order to arrive at their destinations within a certain time frame.  Such planning not infrequently dictates getting on the road in the wee, small hours of the morning or driving all night.  If that is not the usual time for starting your day (or even if it is), you could need copious amounts of coffee and energy drinks in order to remain wakeful and alert.  It is unlikely that the vast majority of these people would be carrying drugs.

A vehicle with cigarettes.  According to the American Heart Association, there are roughly 46 million cigarette smokers in the United States, some of whom are chain smokers. www.americanheart.org/presenter.jhtml?identifier=4731.com (last visited October 11, 2007).  To my knowledge there is not yet a law that prohibits smoking in cars.

Nervousness (or "abnormal" nervousness).  I strongly suspect the standard for "normal" nervousness is respectable, mature, middle class, white Anglo-Saxon males or females, including judges and fellow police officers, stopped for minor traffic offenses.  Indeed, the trial court

27

suggested as much, stating:

> "It [a cited case] said nervousness on the part of the defendant when a police officer approaches is not enough to create reasonable suspicion. And that's true. I mean, normally people are nervous, anyway. I think there was a good explanation here, and it makes sense, that anybody is going to be nervous. I mean, it could be a judge, it could be a public defender, a prosecutor, anybody that gets stopped is nervous, because there's a possibility they're going to get a ticket, and it's unusual to be stopped by somebody carrying -- in a uniform and carrying a gun.

> "What I think was interesting here, and I have to look at, is normally -- I've been in this situation -- once you've been stopped for a minor traffic violation and the guy, the police officer, says, 'Hey, I'm just going to give you a warning,' you have a tendency to relax and say, 'Whew, boy, I'm sure glad I didn't get a ticket.' But that wasn't the situation here. It appeared here that Mr. Roa continued to be nervous, even after he was told he was going to get a warning ticket."

"Extreme" nervousness in the face of police detention would probably be the norm for anyone else, especially an African-American, Hispanic, Asian, or Middle Eastern driver, who is moderately intelligent and keeps up with current events. They fear, not unreasonably, abuse or injury at the hands of the police. It is naive, at best, to think that *that* kind of fear or nervousness

will be alleviated by the simple expedient of telling the driver, "I'm only going to give you a warning."

As judges, we get a false sense of the reliability of these and other indicators that drug interdiction teams – and police officers generally – use in profiling drivers. The only time these stops come to our attention is when contraband is actually found during a search of the vehicle. It tends to appear, therefore, that the law enforcement officers are right one hundred percent of the time. But Sergeant Blanks disabused us of that notion in his testimony. The dialog was as follows:

> "Q    And when you talk about those thousand, roughly a thousand interdiction stops that you've personally made, are those a thousand that have led to the discovery of some sort of contraband, or is that just a thousand stops and then you conducted an investigation and it went one way or another?
>
> "A    A thousand that have led to the discovery of some kind of contraband.
>
> "Q    OK. How many drug interdiction stops would you say you've made where there's been no discovery?
>
> "A    *Two thousand.*
>
> "Q    OK.
>
> "A    *Minimum.*
>
> "Q    *So there are times, and in fact more often than not, if I hear*

29

*you correctly, where you don't discover something that you*

*think might be there?*

"A    *Yes, sir."*  (Emphasis added.)

The testimony was that Sergeant Blanks was *wrong* in two out of every three detentions he made and searches he undertook using the factors he enumerated.  That hardly supports a conclusion that the factors, singly or in combination, constitute "reasonable" suspicion justifying the escalation of a minor traffic stop to a full-blown drug investigation.

It is also worth noting that at least 2000 innocent motorists were detained and their vehicles were searched to no avail by this one officer alone.  If those stops were like this one, the delays were significant and the searches far ranging, including the areas under the hood, in the engine, and behind the airbag.

The trial court made it absolutely clear that its decision was based on Sergeant Blanks' "vast" experience.  But he was, by his own testimony, *wrong more than 67% of the time.*  That kind of experience should not inspire much confidence in either the rationality or the predictive ability of the factors on which he has relied for 17 years and on which he teaches others to rely.  It appears that he has nothing more than "hunches" that are right about one-third of the time.

The majority finds this "disconcerting and entirely relevant for the court's consideration," but notes that this "admitted fallibility is only one factor the trial judge could consider.  It was the trial judge's obligation to determine the significance of this information.  Slip op at 16-17.  The majority continued its effort to downplay the relevance of this "fallibility," saying:

"It is well established, a court may not consider the

productive results of a completed search to bootstrap a finding of

30

an articulable suspicion simply because the officer's hunch was correct.  However, a court would be equally in error were it to reject a search based on a reasonable, articulable suspicion of criminal activity merely because the officer had not found contraband in other unrelated searches.  Here, the court heard evidence that Blanks did not always discover contraband based on his suspicions.  However, each case must be judged on its own unique facts.  In this case, the trial judge properly determined that the search passed constitutional muster."  Slip op at 17.

I believe there are three significant flaws in this conclusion reached by the majority.  First, if you are wrong 67% of the time you rely on certain otherwise-innocent factors, the inevitable and legitimate question raised is whether those factors can, in and of themselves, constitute reasonable, articulable suspicion.  Surely they cannot.  Second, there is nothing to show that the trial court made any evaluation of how or why these factors, viewed independently and objectively by the court,  were more reliable or reasonable in this case than they were in the more than 2000 cases in which the officer relying of them was wrong.  Indeed, there is no indication that the trial court either acknowledged or considered this "admitted fallibility."  Third, when the trial court and courts of review view the factors allegedly giving rise to an articulable suspicion of criminal activity not objectively but through the lens of the officer's experience, as the trial court and the majority have expressly done in this case, any reasonable assessment of the factors as predictors or criminal activity can only appropriately be done taking his 67% failure rate into consideration.

31

As for the two indicators Blanks expressly relied on in this case, the odor of air freshener in Roa's car cannot, alone or in concert with other factors, support a finding of a reasonable suspicion of criminal activity because Blanks himself provided an innocent explanation for its presence. It is true that "[f]acts and circumstances that, if viewed independently, might constitute innocent behavior may provide reasonable suspicion when considered in their entirety to justify a *Terry* stop." *People v. Culbertson*, 305 Ill. App. 3d 1015, 1023, 713 N.E.2d 794, 801 (1999). Here, however, Blanks testified that although air freshener is sometimes used to mask the odor of narcotics, the strength of the odor he detected could be explained by the single air freshener in defendant's car. As previously discussed and as the courts have recognized, a single air freshener and the scent it creates is not an uncommon find and not alone indicative of criminal activity. *People v. Caballes,* 207 Ill. 2d 504, 802 N.E.2d 202 (2003), *reversed on other grounds,* 543 U.S.405, 160 L.Ed.2d 842, 125 S.Ct. 458 (2005). The only other factor Blanks noted that can be considered in conjunction with the air freshener as potentially indicative of criminal activity, is defendant's nervousness--also innocent (and not necessarily unexpected). This court cannot appropriately find that a combination of two such totally innocent circumstances viewed in their entirety give rise to a reasonable suspicion of criminal activity.

We do not weigh the application of these factors in a vacuum. We have been given guidance by the appellate and supreme courts of Illinois. In discussing "to what degree a reasonable suspicion can be based on the arguably innocent nature of the conduct itself," the courts have noted as follows:

> "A *Terry* stop still requires that the officer be able to point to
> specific and articulable facts which raise a reasonable suspicion

32

that the person stopped has committed or is about to commit a crime. [Citation.] The Supreme Court of Illinois recently defined the reasonableness standard for police conduct in the context of a *Terry* stop:

> '"Viewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly."'" *People v. Avant*, 331 Ill. App. 3d 144, 152, 771 N.E.2d 420 (2001), quoting *People v. Love,* 199 Ill. 2d 269, 276, 769 N.E.2d 10, 15 (2002), quoting *People v. Thomas,* 198 Ill. 2d 103, 110, 759 N.E.2d 899, 903 (2001).

Nothing about the scent of a single air freshener, even when combined with "extreme" nervousness, would be so far from the ordinary that it should create an expectation for a competent officer to act quickly. See *People v. Croft*, 346 Ill. App. 3d 669, 675, 805 N.E.2d 1233, 1240 (2004), quoting *Smith,* 331 Ill. App. 3d at 1055, 780 N.E.2d 707, quoting *People v. Anaya,* 279 Ill. App. 3d 940, 945-46, 665 N.E.2d 525 (1996) ("The facts are insufficient to support an investigatory detention when they describe '"'a very large category of presumably innocent travelers, who would be subject to virtually random seizures.' [Citation.]"'"). More than 2000 (67%) of Sergeant Blanks' searches have targeted innocent motorists.

But the majority asserts that "[t]he trial court did not look to these two factors in isolation." Slip op at 14. Rather, [t]he trial court considered Sergeant Blanks' testimony and carefully pointed out many factors that supported finding a reasonable, articulable suspicion based on a totality-of-the-circumstances analysis. Slip op at 15. This is simply not true. The

33

trial court's decision expressly relied on the facts that: (1) Blanks has 17 years of experience or more; (2) He is not a rookie that just came on; (3) He has significant training; (4) He has been in court many, many times in these situations; (5) Obviously from his testimony, he knows what he is doing; (6) He can describe the scent of cocaine; ((7) He can describe masking agents; and (8) He is very well versed in cocaine or controlled substance trafficking.

The trial court did not acknowledge or discuss the fact that despite every single one of those factors, more than 2000 (67%) of Sergeant Blanks' searches had targeted innocent motorists. If one is going to give this much deference to the experience of the law enforcement officer, his or her track record is not just relevant, it is critical. There is nothing in the record to even suggest that the trial judge did this.

Because the two innocent factors cited by Sergeant Blanks cannot, singly or in concert, provide the requisite reasonable, articulable suspicion of criminal activity to permit extension of the stop and elevation to a criminal investigation, I disagree with the author's rationale for affirming the denial of the motion to suppress.

I turn now to the rationale employed by the special concurrence to conclude that the search was totally appropriate because there was no second seizure requiring constitutional consideration. Rather it contends there was a consensual encounter which did not involve coercion or detention and thus does not implicate the fourth amendment. In this case we have a situation where an armed, uniformed police officer has just stopped a motorist for a traffic violation, detained him, and issued him a legal paper documenting that violation. He returns the driver's license, registration, and proof of insurance, and, according to Roa, starts to return to his squad car. He then turns, says, "Wait a minute, Andres," and begins to ask a series of questions,

not about the weather or the Cubs or the amazing growth of corn in the surrounding fields. No, he asks whether you own the things in your car [or are they stolen?], whether anyone else has given you something to carry, whether you have any illegal material in your car, and then whether he can search – all questions intimating that he suspects you of criminal activity (which, in fact, he does). With all due respect, it is disingenuous at best, to argue that any reasonable person in these circumstances would not think he or she was being officially detained and thus had been "seized."

Certainly, it is clear from Roa's testimony that he, individually and particularly, believed he had been detained again by Sergeant Blanks. He asserted that he only consented to the search of his trunk. When asked why, if he had only agreed to tender his trunk, he did not object when the officer proceeded to hit on the passenger door of the car and search under the hood and check inside the engine, he said, "I can say he's the police, what can I do? *** You know, I think they are the law, they are the police. You know, I don't want to be in trouble, you know." There is no way this is a consensual encounter free of coercion (or intimidation) and detention. It is a seizure and therefore subject to the requirement that the officer have a reasonable articulable suspicion in order to continue to detain the defendant.

I believe – with Justice Wright – that there was a second seizure and that the search could only be justified by a showing of a reasonable articulable suspicion of criminal activity. For the reasons previously discussed, I do not agree that Sergeant Blanks had such justification, nor do I believe the trial judge looked past the officer's years of experience to give serious consideration to the question of reasonableness. The case should be reversed on this basis alone.

II. Did Roa Consent to the Full Search of his Vehicle?

35

The second question is whether Roa gave consent to search his entire vehicle or only his trunk. Although, in light of my conclusion on the first question, it would not be necessary to reach this second one, the question is important in this case. Sergeant Blanks testified that if Roa had refused consent to search, he would have honored that refusal and simply let him go. Thus it would seem that if defendant only consented to the search of his trunk and the officers had honored the limited extent of his consent, they would have found nothing to excite further suspicion and they would presumably have let him go on his way. There would have been no case.

It does not appear that the trial court in the instant case did any more in evaluating this factual dispute than to defer, as it did on the issue of reasonable articulable suspicion, to the length of Sergeant Blanks' experience and his perceived expertise. Although the record discloses a credibility finding with regard to the speed at which Roa was driving, I was unable to find any explicit credibility finding on the extent of Roa's consent. Thus, that becomes a factual matter to be resolved pursuant to *de novo* review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). The majority undertook no review of defendant's contention.

### III. What was Roa's Reasonable Expectation of the Scope of his Consent?

The third question assumes for the purpose of this discussion that the consent was for a search of "the vehicle" and addresses the level of intrusiveness justified by such consent. Because I would not find it necessary to reach this issue in light of my answer to the first question, I am reluctant to engage in an extended legal analysis. I would, however, make a couple of general observations.

This is a stop that occurred on the side of a busy interstate highway. The motorist was

36

ostensibly stopped for modestly exceeding the posted speed limit. Upon completion of the traffic stop, the officer sought (and secured) consent of the driver to search the car.

What might a reasonable motorist expect the nature of that search -- and thus the parameters of his consent -- to be? Roa indicated that he expected his trunk to be searched because Sergeant Blanks had asked about it. We have no idea why Roa might have thought or said there were antiques in the trunk. In point of fact, the trunk was searched and no contraband was found. A reasonable motorist might anticipate the officer looking at the seats and floor in the car's interior and even in the glove compartment. I do not believe any reasonable motorist would expect his or her consent to authorize the virtual dismantling of the vehicle on the side of the highway.

A minimally informed citizen would probably assume that such an extensive search would require a warrant. Indeed, *I* would think a warrant would be necessary. Ordinary citizens who learned about the constitution in high school civics classes might quite reasonably anticipate that a search pursuant to consent would be limited to plain sight, plain hearing and plain smell and that an officer who wanted to undertake a more invasive search would still have to secure a warrant from a judge. However, if they ever have need of that or many other of the constitution's specific and expressed protections, they are in for a rude awakening. It is no longer the constitution's purpose to protect "the people" from the excesses of an over zealous and overreaching government. The document has, for all intents and purposes, been rewritten by the judiciary. Its new purpose is to shield such governmental conduct (or misconduct) from containment and constraint by the citizenry. Every time a citizen cries "foul," we create a new exception, a new excuse, a new construction.

For all of these reasons, I respectfully dissent from the majority opinion.