# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 12, 2008

Charles R. Fulbruge III
Clerk

No. 07-10767
Summary Calendar

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

MICHAEL DEWAYNE VICKERS

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before STEWART, OWEN, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Michael Dewayne Vickers was convicted, after a jury trial, of being a felon in possession of a firearm in violation of federal law. Vickers timely appeals and challenges both his conviction and sentence. We AFFIRM.

## I. BACKGROUND

On August 5, 2005, at approximately 3:00 p.m., the Dallas Police Department received a 911 call reporting a burglary. The caller described the burglar as a black male dressed in a red T-shirt and a dark-colored pair of shorts, and stated that the perpetrator might still be in the area. Vickers was walking down the street of his neighborhood in Dallas, Texas. The Dallas Police Department dispatched officers to investigate.

The first officer to arrive at the scene observed a black male wearing a red T-shirt and dark shorts walking on the sidewalk near the house that had been burglarized. It was Vickers. The officer stepped out of his patrol car and ordered Vickers to put his hands on the hood of the police vehicle. Vickers initially complied, but as the officer began to pat him down, Vickers said, "I can't go to jail," and attempted to flee. Vickers ran only a few steps before he was subdued and handcuffed.

After Vickers was subdued, the officers completed the search and discovered a .38 caliber pistol in the front left pocket of Vickers's pants. After Vickers's arrest, the person who had placed the 911 call approached and told the officers they "had the wrong guy." It is now undisputed that Vickers was not involved in the burglary that prompted the 911 call. Vickers's arrest was based solely on possession of the weapon found as a result of the search.

Vickers was charged with being a felon in possession of a firearm. See 18 U.S.C. §§ 922(g)(1) & 924(e)(1). Vickers's prior felony convictions justifying the charge included murder, burglary of a habitation, and unlawful delivery of a controlled substance. At his trial, Vickers presented no defense. His counsel informed the jury in closing arguments that the trial essentially "pertain[ed] to Mr. Vickers' right to appeal." After brief deliberations, the jury returned a verdict of guilty.

At sentencing, the district court adopted the recommendation of the Presentence Report. The PSR determined that Vickers's three prior felony convictions constituted either a "violent felony" or a "serious drug offense," and designated Vickers as an Armed Career Criminal for purposes of sentencing. This designation mandated the imposition of a minimum sentence of fifteen years. Vickers objected to the characterization of his prior state conviction for delivery of a controlled substance as a "serious drug offense." The district court overruled the objection. The district court also denied Vickers's request for a two-level reduction in his sentence for acceptance of responsibility.

The final calculation placed Vickers's offense level at 33 with a Criminal History Category of IV. This resulted in a Sentencing Guideline range of 188 - 235 months. The district court sentenced Vickers to 190 months' imprisonment and three years of supervised release. The court adjusted the sentence from 190 months to 168 months to account for 22 months of incarceration by the state of Texas that would not be credited to his sentence by the U.S. Bureau of Prisons.

On appeal, Vickers challenges both his conviction and sentence.

## II. DISCUSSION

A.    Motion to Suppress

Vickers's first argument is that the district court erred in denying his motion to suppress. In evaluating a refusal to suppress evidence, we review questions of law de novo and factual findings for clear error. United States v. Mata, 517 F.3d 279, 284 (5th Cir. 2008). In addition, where, as here, the police acted without a warrant, the burden is on the Government to prove that the search was valid. United States v. Waldrop, 404 F.3d 365, 368 (5th Cir. 2005).

Vickers argues that the initial police action – pulling up in marked police vehicles and immediately instructing Vickers to place his hands on the police car – constituted an unconstitutional seizure under the Fourth Amendment because the officers had neither a warrant nor probable cause. The Government, on the other hand, characterizes the officers' actions as a permissible "stop and frisk" because the officers had reasonable suspicion that Vickers was involved in the reported burglary based on the information provided in the 911 call.

The Fourth Amendment provides these relevant protections:

> The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops by persons or vehicles that fall short of traditional arrest. Because the balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot.

United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotes and citations omitted). The legality of a "stop and frisk" requires this analysis: were the officer's initial actions justified when they occurred, and was there a reasonable relation between subsequent actions and the circumstances that supported the stop? United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).

(a)  The initial stop

The initial stop in a situation such as this is proper when "the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." United States v. Hensley, 469 U.S. 221, 227 (1985) (emphasis and citation omitted). Reasonable suspicion requires less information and certainty than the probable cause needed to make an arrest. United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000). Whether an officer has reasonable suspicion to stop is answered from the facts known to the officer at the time.

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry [v. Ohio, 392 U.S. 1 (1968),] recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

Adams v. Williams, 407 U.S. 143, 145-46 (1972).

The record shows that the police received an emergency phone call, in which the caller reported that his own home had just been burglarized. The victim provided his name, address, telephone number, as well as other personal information. In response to the call, the following dispatch was sent: "Burglary just occurred by unknown black male last seen wearing red shirt, blue or black shorts. Suspect near location." Upon arriving at the location, the officers discovered Vickers – about 75 to 100 yards from the burglarized home – wearing clothing that met the description of the reported burglar. Considering the

totality of the circumstances in this case, we find that the officers had a "particularized and objective basis" to believe that a crime had been committed and that Vickers was involved.  Arvizu, 534 U.S. at 277.

Vickers argues that the 911 call was nothing more than an unreliable anonymous tip, which did not provide reasonable suspicion.  Vickers is factually and legally incorrect.   This was not anonymously-provided information; an identified citizen had been victimized by a crime and was reporting it.  The question of whether a 911 call has a sufficient indicia of reliability to provide reasonable suspicion to justify a stop is evaluated based on the circumstances of each case.  A good starting point is the presumption of "the reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion, particularly when the caller identifies" who he or she is.  United States v. Drake, 456 F.3d 771, 775 (7th Cir. 2006); see also United States v. Burbridge, 252 F.3d 775, 778-79 (5th Cir. 2001) ("when an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case.") (citation omitted).

In this case, a burglary victim not only gave his name, he also provided several other pieces of information to identify himself and the burglar.  The 911 call in this case was sufficiently detailed that the police were justified in relying on it to establish reasonable suspicion.

(b)    Scope of the stop

Though the police had reasonable suspicion to stop Vickers, the officers' actions must not exceed the permissible scope of the stop.  United States v. Dortch, 199 F.3d 193, 198 (5th Cir. 1999).  The question is whether the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  United States v. Sharpe, 470 U.S. 675, 686 (1985).

The means of investigation pursued here was a frisk, which the Supreme Court has held is appropriate when the officer fears that the suspect is armed and poses a danger to the officer or others. Terry, 392 U.S. at 24. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27. The responding officer testified that he immediately frisked Vickers because Vickers fit the description provided by the 911 caller and Vickers was near where the burglary occurred. The officer also testified, based on seventeen years of experience, that burglary suspects are often armed. He felt his own safety required a pat-down of Vickers. The reasonableness of police conduct includes consideration of "the specific reasonable inferences that the officer is entitled to draw from the facts in light of his experience and training." United States v. Sanders, 994 F.2d 200, 203 (5th Cir. 1993). Based on the totality of the circumstances, the district court did not err in finding that the officer's pat-down was reasonable.

The question of whether the officer should have pursued less intrusive means (for example engaging in conversation with Vickers before commencing the frisk) does not factor into our analysis. The Supreme Court has instructed that, once an officer has established reasonable suspicion, appellate courts are limited in reviewing how the police choose to alleviate that suspicion if the intrusion is no longer than necessary to dispel the suspicion:

> The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and [ ] would require courts to indulge in unrealistic second-guessing.

United States v. Sokolow, 490 U.S. 1, 11 (1989) (internal quotes and citations omitted). In that case, the defendant's argument that officers were obligated to engage in conversation prior to detaining defendant was rejected. Id.

Vickers argues that two factors weigh against a finding that the officers had a reasonable basis to stop and frisk him. First, he cites to a discrepancy in police documentation regarding the time that the police were dispatched and the time of Vickers's arrest. Specifically, the arrest report indicated that Vickers was arrested at 2:57 p.m., even though the dispatch related to the burglary occurred at 2:59 p.m. Vickers argues that, if the times as reported are true, the officers lacked reasonable suspicion to stop Vickers, because they had not learned of the burglary at the time of the stop. The officers testified that the time discrepancy was a clerical mistake by a data entry clerk. The district court accepted that testimony. There was no clear error in that factual conclusion. United States v. Jordan, 232 F.3d 447, 448 (5th Cir. 2000).

Vickers's second argument is that any reasonable suspicion for a Terry stop and frisk was tainted by the arresting officer's subjective belief that he was going to arrest Vickers at the time of the initial stop. Courts "are precluded from giving weight to the subjective intent of police officers" in evaluating the constitutionality of a stop. United States v. Holloway, 962 F.2d 451, 458 (5th Cir. 1992). The standard we apply to the reasonableness of a stop is an objective one – were the officers objectively authorized to act as they did viewing the totality of the circumstances. Id. at 458 n.19. The officers' actions were objectively reasonable regardless of their subjective intent.

In sum, reasonable suspicion existed to believe that Vickers was engaged in a recently completed burglary, which gave the officers the right to stop him. Furthermore, the officers did not exceed the permissible scope of the stop when the officers sought to pat down Vickers. True, the police were incorrect in their initial suspicion that Vickers was involved in the burglary that prompted the police response. That hindsight does not change the Fourth Amendment analysis of whether the stop and frisk of Vickers was reasonable. Therefore, the district court did not err in denying Vickers's motion to suppress.

B.      Lack of Nexus Between Interstate Commerce

Vickers's other challenge to his conviction is that the Government failed to sustain its burden that the gun found on Vickers "affect[ed] interstate commerce" – an essential element of the statute Vickers was charged with violating. This court has held that evidence similar to what was presented in this case is sufficient to establish the "interstate commerce" element of Section 922(g)(1). United States v. Dancy, 861 F.2d 77, 81 (5th Cir. 1988). To the extent Vickers challenges the constitutionality of this section, this argument has been foreclosed in this Circuit. Vickers has preserved the issue should that later be relevant. See United States v. Daugherty, 264 F.3d 513, 518 (5th Cir. 2001).

C.      Armed Career Criminal Act enhancement

Vickers also challenges his sentence. The first issue is whether the district court properly found him subject to the Armed Career Criminal Act (ACCA). See 18 U.S.C. § 924(e). The designation caused a fifteen-year mandatory minimum sentence. An armed career criminal is a felon in possession of a firearm who has three prior convictions for a "violent felony" or a "serious drug offense." Id. For a "serious drug offense" to qualify under the enhancement, it must also have a possible sentence of ten years or more. 18 U.S.C. 924(e)(2)(A)(i).[1]

The district court found that three of Vickers's prior convictions satisfied these statutory requirements. Vickers does not challenge the findings on two of the three convictions – murder and burglary of a habitation. However, he alleges that the third conviction – delivery of a controlled substance – is not a "serious drug offense" under the ACCA.

A "serious drug offense" under the ACCA is "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture

---

[1] The parties do not dispute that Vickers's prior drug conviction was a first degree felony punishable by a maximum prison term of 99 years. Tex. Pen. Code Ann. § 12.32(a). Therefore, that conviction meets the minimum penalty requirement of the ACCA.

or distribute, a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(ii). The Texas statute supporting Vickers's conviction applied to a person who "knowingly manufactures, delivers, or possesses with intent to deliver" a controlled substance. Tex. Health & Safety Code Ann. § 481.112 (2003). The Texas statute defines delivery to include actual or constructive transfer or "offering to sell" the substance. Tex. Health & Safety Code § 481.002(8) (2003).

We review application of the armed career criminal enhancement de novo. United States v. Munoz, 150 F.3d 401, 419 (5th Cir. 1998). In determining whether an offense satisfies the ACCA, a court is limited to "examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual findings by the trial judge to which the defendant assented." Shepard v. United States, 544 U.S. 13, 16 (2005).

We have noted that the Texas statute could be violated by a range of conduct between an offer to sell to actual delivery of a controlled substance. The charging document and state court judgment do not inform us what Vickers was accused of doing. The charging document states that Vickers

> did knowingly and intentionally deliver, to-wit: actually transfer, constructively transfer, and offer to sell a controlled substance, to-wit: COCAINE in an amount . . . of less than 28 grams, to CS Shields.

The state court judgment adds no useful detail. It does not reflect whether the judge found that Vickers: (1) actually transferred; (2) constructively transferred; (3) offered to sell; or (4) offered to sell and then actually or constructively transferred the cocaine. The Government concedes that conviction could be based on any one of the alternatives. Therefore, nothing negates the possibility that Vickers was convicted solely for offering to sell a controlled substance.

Vickers relies on a precedent in which the defendant was convicted of reentry by a removed alien. United States v. Gonzales, 484 F.3d 712, 714 (5th Cir.), cert. denied, 127 S. Ct. 3031 (2007). At sentencing, the Government sought to enhance Gonzales's sentence under the Sentencing Guidelines as a prior "drug trafficking offense."[2] The ACCA was not discussed. The only relevance of Gonzales is that the prior conviction was under the Texas statute that is at issue here. We held that Gonzales's conviction under the Texas statute for offering to sell a controlled substance was not a "drug trafficking offense." For the enhancement to be applicable, the offense must be one that "prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute or dispense." Id. at 715 n.1 (quoting U.S.S.G. § 2L1.2, cmt. n.1(B)(iv)). Our question was whether an offer to sell could be considered any of those actions. It could not be, and we found the enhancement inapplicable. Gonzales, 484 F.3d at 716.

Unlike the Gonzales court, we are not faced with interpreting the "drug trafficking" enhancement under the Sentencing Guidelines. Our interpretive issues arise from the Armed Career Criminal Act. If the definition in the ACCA of a "serious drug offense" were identical to the definition of a "drug trafficking offense" in the Guidelines, then the Gonzales holding would be relevant. The two definitions are not identical. The drug trafficking enhancement lists specific convictions (e.g., manufacture, import) that support the enhancement. The ACCA applies to convictions "involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . ." 18 U.S.C. § 924(e)(2)(A)(ii) (emphasis added).

---

[2] The Sentencing Guidelines (§ 2L1.2) provide for a 16-level enhancement for a defendant convicted of unlawfully reentering the United States if the defendant has a prior felony conviction for a "drug trafficking offense."

The word "involving" is an exceedingly broad term for a statute. One of our precedents has addressed this part of the ACCA. United States v. Winbush, 407 F.3d 703 (5th Cir. 2005). There, one of the underlying felonies justifying imposition of the ACCA enhancement was a conviction for attempted possession of cocaine with intent to distribute under a Louisiana statute. Id. at 704. Winbush argued that the inchoate crime of attempt to possess did not qualify as a "serious drug offense" to justify the ACCA enhancement. Id. at 705. The court held that the inclusion of the word "involving" in the ACCA demonstrated that Congress intended the category of convictions considered a "serious drug offense" to be expansive:

> [t]he word 'involving' has expansive connotations, and we think it must be construed as extending the focus of § 924(e) beyond the precise offenses of distributing, manufacturing, or possessing, and as encompassing as well offenses that are related to or connected with such conduct.

Id. at 707 (quoting United States v. King, 325 F.3d 110, 113 (2d Cir.), cert denied, 540 U.S. 920 (2003)). In Winbush, the court concluded that an attempted possession of cocaine was of a type "involving" possession.

Vickers correctly points out that the Louisiana statute in Winbush is not identical to the Texas delivery statute. The Louisiana attempt statute requires a showing that the defendant took steps toward obtaining possession of the controlled substance with the specific intent to commit the offense of possession with intent to distribute. State v. Harris, 846 So. 2d 709, 713 (La. 2003). The Texas delivery statute requires less: "The offense is complete when by words or deed, a person knowingly or intentionally offers to sell what he states is a controlled substance." Stewart v. State, 718 S.W.2d 286, 288 (Tex. Crim. App. 1986). The intentional offer to sell a controlled substance is the crime; the accused need not have any drugs to sell or even intend ever to obtain the drugs

he is purporting to sell. Francis v. State, 890 S.W.2d 510, 513 (Tex. App. 1994) (statute requires neither possession nor actual/constructive transfer of a controlled substance at the time of an offer to sell).

Despite the statutory differences, our issue is whether a Texas conviction for offering to sell a controlled substance is one "involving" distribution of a controlled substance under the ACCA. We begin with the presumption that Congress "says in a statute what it means and means in a statute what it says there." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992). The plain meaning of the term "involving" means "related to or connected with." Winbush, 407 F.3d at 707 (quoting King, 325 F.3d at 113). The ACCA is intended to cover those individuals whose prior convictions indicate an "increased likelihood that the offender is the kind of person who might deliberately point the gun and pull the trigger." Begay v. United States, 128 S. Ct. 1581, 1587 (2008). The expansiveness of the word "involving" supports that Congress was bringing into the statute's reach those who intentionally enter the highly dangerous drug distribution world. Being in the drug marketplace as a seller – even if, hypothetically, the individual did not possess any drugs at that time – is the kind of self-identification as a potentially violent person that Congress was reaching by the ACCA.

We have discussed that there is no evidence of how Vickers participated in the drug marketplace. It is the nature of the jurisprudence surrounding some sentencing enhancements based on prior convictions, when the details of those prior convictions do not appear in usable documentation, to have to discuss speculative possibilities. We find nothing illogical, unreasonable or unfair about interpreting this part of the ACCA in its most straightforward way. The offenses specified by the Texas statute – from the offer to sell, to attempted delivery, to actual delivery – are all offenses which are "related to or connected with" the

distribution of drugs. Winbush, 407 F.3d at 707 (quoting King, 325 F.3d at 113). Therefore, we hold that the district court did not err in concluding that Vickers's Texas conviction for delivery of a controlled substance was a "serious drug offense" for purposes of the ACCA.[3]

D.    Sentence Reduction for Acceptance of Responsibility

Vickers's final argument is that the district court erred in denying his request for a reduction in sentence for acceptance of responsibility. The Sentencing Guidelines provide that if a defendant "clearly demonstrates acceptance of responsibility" for the offense, his sentence can be reduced two levels. U.S.S.G. § 3E1.1. Because the district judge is well-positioned to evaluate the appropriateness of a reduction in sentence based on acceptance of responsibility, the standard to review a denial is extremely deferential. United States v. Chapa-Garza, 62 F.3d 118, 122 (5th Cir. 1995).

Vickers argues that the district court erred in failing to find the following to be decisive: (1) Vickers went to trial solely to preserve his ability to appeal questions of law; (2) the defense presented no evidence at trial; (3) at trial counsel only cross examined one of the Government's witnesses; (4) Vickers stipulated to the fact that he had previously been convicted of a felony; (5) in closing argument counsel all but conceded guilt – by telling the jury Vickers was proceeding to trial to preserve issues for appeal; and (6) Vickers pled guilty to

---

[3] We recognize that this holding means that an offense could be found to satisfy the ACCA requirements, while the same offense would not be sufficient to trigger an enhancement under the Sentencing Guidelines. For example, in Gonzales as well as United States v. Price, 516 F.3d 285 (5th Cir. 2008), we held that "delivery" under this Texas statute does not constitute either a "drug trafficking offense" (Gonzales) or a "controlled substance offense" (Price) for sentencing purposes. These cases, however, are based on the specific language of those two enhancements. Here we are faced with a statute whose language encompasses offenses "involving" distribution – broad enough language to cover an offer to sell.

essentially the same crime in state court based on the same underlying events – indicating an admission of guilt.

Vickers placed these same facts before the district court and the court found them unconvincing. Vickers had rejected a conditional guilty plea offered by the Government, put the Government to its burden of proof in a jury trial, sought a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and in closing argument urged the jury to find that the Government had not proven its case beyond a reasonable doubt. Based on this record we cannot find that the district court abused its broad discretion in denying Vickers's request for a reduction in sentence for acceptance of responsibility.

AFFIRMED.