**UNITED STATES of America**

v.

**Demond Andrew ALEXANDER.**

**Criminal Action No. 4:08–CR–104.**

United States District Court,
E.D. Texas,
Sherman Division.

Aug. 27, 2008.

Maureen E. Smith, U.S. Attorney's Office, Sherman, TX, for Plaintiff.

Denise S. Benson, Federal Defender's Office, Sherman, TX, for Defendant.

## MEMORANDUM AND ORDER

MARCIA CRONE, District Judge.

Pending before the court is Defendant Demond Andrew Alexander's ("Alexander") Motion to Suppress Evidence and Statements (# 19). In his motion, Alexander seeks to suppress all physical, documentary, and other evidence seized, as well as oral statements made, in connection with the stop and search of his person and vehicle on November 30, 2006. Specifically, Defendant contends that the detention of his vehicle exceeded the scope of the initial traffic stop and that the subsequent warrantless search and seizure lacked probable cause. Thus, Alexander argues that the evidence was illegally obtained and is inadmissible as a matter of law. Having viewed the videotape of the stop and considered the testimony elicited during a hearing on the motion to suppress, the submissions of the parties, the arguments of counsel, and the applicable law, the court is of the opinion Defendant's motion should be denied.

## I. *Background*

On November 30, 2006, Trooper Richard John Smith ("Smith") of the Texas Department of Public Safety ("DPS") was patrolling a stretch of Interstate 35 in Denton County, Texas.[1] At approximately 9:47

---

1. Denton County, Texas, is located within the Eastern District of Texas, Sherman Division.

p.m., after observing a Chevrolet Monte Carlo with a defective rear license plate light pass by, Smith activated his emergency lights and pulled over the vehicle just north of Sanger, Texas.[2] Alexander was the driver and Jason Lee Walker ("Walker") was the sole passenger in the automobile. The entire traffic stop was recorded on a video camera installed in Smith's patrol car.

Smith approached the vehicle from the passenger side and entered into a brief discussion with the occupants. He explained the reason for the traffic stop and then requested a driver's license from both individuals. While engaged in conversation, Smith observed that Alexander and Walker avoided any kind of eye contact and exhibited extreme nervousness. He also testified that Alexander's hand was shaking as he relinquished his license and that Walker's carotid artery was pulsating. Further, he described Walker's breathing as "unusually heavy."

Noticing that Alexander presented an Arkansas driver's license and the vehicle bore Arkansas license plates, Smith was puzzled by the occupants' circuitous itinerary to their declared destination of Oklahoma City, Oklahoma. As Smith testified, traveling from Little Rock, Arkansas, to Oklahoma City via Dallas was an "indirect route" and that "there was a much shorter way." Additionally, Smith noticed a number of air fresheners affixed throughout the interior of the vehicle, unopened packages of air fresheners on the floorboard, and a single key in the ignition. These factors, according to Smith, led him to believe that criminal activity was afoot.

Smith subsequently returned to his patrol car to perform driver's license and warrant checks. The dispatcher relayed the results of the checks—finding no outstanding warrants—at 9:53 p.m. Rather than immediately issuing a warrant or citation for the defective license plate light, Smith returned to the driver's side of the automobile to resume questioning the occupants due to his suspicion of nefarious activity. Within two minutes, the occupants communicated different accounts of their journey in separate interviews. Alexander stated that they had left Arkansas several days prior to the stop while Walker maintained that they had left that morning.

Based on what he perceived to be indicators of potential criminal activity, Smith requested consent to search the vehicle approximately twenty minutes after the stop was initiated. Alexander gave his consent. Upon the arrival of a second officer, a quick search of the interior of the vehicle revealed two false compartments secreted behind decorative panels containing what Smith believed to be "narcotics in bundles." Smith terminated the consent search, arrested Alexander and Walker, and advised them of their *Miranda* rights. After the vehicle was towed to a DPS office, an inventory search uncovered ten kilograms of cocaine.

## II. *Analysis*

■ The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

28 U.S.C. § 124(c)(3).

**2.** Sanger is approximately fifty miles northwest of Dallas, Texas.

U.S. Const. amend. IV. "The purpose of the 'Fourth Amendment is to "shield the citizen from unwarranted intrusions into his privacy." ' " *United States v. Magana,* 544 F.Supp.2d 560, 564 (W.D.Tex.2008) (quoting *United States v. Ramon,* 86 F.Supp.2d 665, 670 (W.D.Tex.2000) (quoting *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958))). It is well-settled that the temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" within the meaning of the Fourth Amendment. *See Brendlin v. California,* 551 U.S. 249, ——, 127 S.Ct. 2400, 2406, 168 L.Ed.2d 132 (2007); *see also Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Jackson,* 517 F.Supp.2d 859, 868 (W.D.La.2007) (citing *United States v. Valadez,* 267 F.3d 395, 397 (5th Cir.2001)). Nevertheless, because traffic stops are considered more akin to investigative detentions rather than formal arrests, "[a]n automobile stop is subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren,* 517 U.S. at 810, 116 S.Ct. 1769; *see also United States v. Shabazz,* 993 F.2d 431, 434 (5th Cir.1993).

■ Unlike more traditional searches and seizures, reasonableness in the context of traffic and investigatory stops does not turn on probable cause. In such instances, limited searches and seizures are justified when the police have reasonable suspicion supported by articulable facts that a crime has been or is being committed. *See United States v. Vickers,* 540 F.3d 356, 360–61 (5th Cir.2008); *United States v. Martinez,* 486 F.3d 855, 861 (5th Cir.2007); *United States v. Jenson,* 462 F.3d 399, 403 (5th Cir.2006); *United States v. Kye Soo Lee,* 898 F.2d 1034, 1039 (5th Cir.1990), *cert. denied,* 506 U.S. 1083, 113 S.Ct. 1057, 122 L.Ed.2d 363 (1993); *United States v. Lee,* No. 1:06–CR–125, 2007 WL 1567098, at *5

(E.D.Tex. May 29, 2007) (citing *United States v. Lopez–Moreno,* 420 F.3d 420, 430 (5th Cir.2005), *cert. denied,* 546 U.S. 1222, 126 S.Ct. 1449, 164 L.Ed.2d 146 (2006)). "The law is sensitive to the specific facts of each case, gives due regard to the experience and training of police officers, and strives to balance the public interest against the individual's right to be free from arbitrary intrusions by the government." *United States v. Salinas,* No. 07–CR–436, 2008 WL 2571866, at *2 (W.D. Tex. June 17, 2008) (citing *United States v. Jaquez,* 421 F.3d 338, 340–41 (5th Cir. 2005); *United States v. Brigham,* 382 F.3d 500, 506 (5th Cir.2004)).

■ Traffic and investigatory stops oftentimes, as in this case, lead to the search for contraband. In these situations, in order to determine whether a search or seizure is "unreasonable" and in violation of the Fourth Amendment, courts must analyze: (1) whether the stop was justified at its inception; and (2) whether the search was reasonably related in scope to the circumstances justifying the stop or to reasonable suspicion that arose before the initial purpose of the stop was fulfilled. *Terry v. State of Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Jenson,* 462 F.3d at 403–04; *Lopez–Moreno,* 420 F.3d at 430; *Brigham,* 382 F.3d at 506; *Lee,* 2007 WL 1567098, at *5.

■ Generally, a defendant who seeks to have evidence suppressed bears the burden of proving that the evidence was seized illegally. *See United States v. Hernandez–Reyes,* 501 F.Supp.2d 852, 857 (W.D.Tex.2007) (citing *United States v. Waldrop,* 404 F.3d 365, 368 (5th Cir.2005)). When a search or seizure is conducted without a warrant, however, the burden shifts to the government to show that the search or seizure was reasonable. *See United States v. Gonzalez,* No. 5:07–CR–4, 2007 WL 2177340, at *6 (E.D.Tex. July 30,

2007) (citing *United States v. Chavis,* 48 F.3d 871, 872 (5th Cir.1995)); *Hernandez–Reyes,* 501 F.Supp.2d at 857. Accordingly, in the instant case, the government bears the burden of proving by a preponderance of the evidence that the stop of Alexander's vehicle was reasonable, *i.e.,* that it was based upon probable cause that he committed a traffic violation and that the subsequent warrantless search of the vehicle, and seizure of evidence, was reasonable.

### A. Whether the Stop was Justified at its Inception

 A stop is justified at its inception if the officer has probable cause to believe that a traffic violation has occurred. *See Whren,* 517 U.S. at 810, 116 S.Ct. 1769; *see also United States v. Khanalizadeh,* 493 F.3d 479, 482 (5th Cir.2007); *Lopez–Moreno,* 420 F.3d at 430 (citing *United States v. Breeland,* 53 F.3d 100, 102 (5th Cir.1995)). "The rule established by the Supreme Court in *Whren* allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop." *United States v. Cole,* 444 F.3d 688, 689 (5th Cir.2006) (citing *Whren,* 517 U.S. at 810, 116 S.Ct. 1769). The legal justification for the traffic stop, however, must be "objectively grounded." *Id.* (citing *United States v. Miller,* 146 F.3d 274, 279 (5th Cir.1998)).

 Here, the court finds that the initial stop of the Chevrolet Monte Carlo was justified. Texas law provides:

A taillamp or a separate lamp shall be constructed and mounted [to a vehicle] to emit a white light that:

(1) illuminates the rear license plate; and

(2) makes the plate clearly legible at a distance of 50 feet from the rear.

TEX. TRANSP. CODE ANN. § 547.322(f) (Vernon 1999). Moreover, " '[w]hen a traffic violation is committed within an officer's view, the officer may lawfully stop and detain a person for the traffic violation.' " *Conde v. State,* 135 S.W.3d 252, 254–55 (Tex.App.-Waco 2004, no pet.) (quoting *Bellard v. State,* 101 S.W.3d 594, 600 (Tex. App.-Waco 2003, pet. ref'd)); *see also Garcia v. State,* 827 S.W.2d 937, 944 (Tex. Crim.App.1992). Here, the court concludes, as conceded by the defendant at the suppression hearing, that Smith had probable cause to stop Alexander when he observed the absence of a functional license plate light on the rear of his vehicle. Thus, the purpose for the initial detention was justified at its inception, satisfying the first prong of the *Terry* test. *See Whren,* 517 U.S. at 810, 116 S.Ct. 1769; *Khanalizadeh,* 493 F.3d at 482; *Lopez–Moreno,* 420 F.3d at 430.

### B. Whether the Detention was Extended Beyond its Legitimate Initial Purpose

 Even if a traffic or investigatory stop is justified at its inception, *Terry*'s second prong requires that any subsequent search and seizure be reasonably related in scope to the circumstances that justified the stop in the first place. *Terry,* 392 U.S. at 19–20, 88 S.Ct. 1868. The detention of an individual must be "temporary and last no longer than is necessary to effectuate the purpose of the stop. . . ." *Brigham,* 382 F.3d at 507; *see also Jenson,* 462 F.3d at 404; *United States v. Dortch,* 199 F.3d 193, 200 (5th Cir.1999). "There is, however, no constitutional stopwatch on traffic stops." *Brigham,* 382 F.3d at 511.

 "In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen." *Lopez–Moreno,* 420 F.3d at 430 (citing *Brigham,* 382 F.3d at 507–08). "An officer may also ask the driver about the

purpose and itinerary of his trip." *Id.* at 430–31. The officer's questions "need not even be related to the purpose of the traffic stop, since ' "[d]etention, not questioning, is the evil at which *Terry*'s second prong is aimed." ' " *Id.* at 431 (quoting *Brigham,* 382 F.3d at 508 (quoting *Shabazz,* 993 F.2d at 436)).

■ "If all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop." *Jenson,* 462 F.3d at 404; *see also Lopez–Moreno,* 420 F.3d at 431; *United States v. Santiago,* 310 F.3d 336, 341–42 (5th Cir. 2002); *United States v. Jones,* 234 F.3d 234, 241 (5th Cir.2000); *United States v. Dortch,* 199 F.3d 193, 200 (5th Cir.1999). Nevertheless, " 'if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been dispelled or confirmed.' " *Jenson,* 462 F.3d at 404 (quoting *Lopez–Moreno,* 420 F.3d at 431); *see also Magana,* 544 F.Supp.2d at 566 (citing *Brigham,* 382 F.3d at 507). "Reasonableness is measured in objective terms by examining the totality of the circumstances." *Magana,* 544 F.Supp.2d at 566 (citing *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)); *Salinas,* 2008 WL 2571866, at *3. "Courts have consistently 'eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry.' " *Magana,* 544 F.Supp.2d at 566 (quoting *Robinette,* 519 U.S. at 39, 117 S.Ct. 417); *accord Salinas,* 2008 WL 2571866, at *3. The Supreme Court has "expressly disavowed any 'litmus-paper test' or single 'sentence or paragraph ... rule,' in recognition of the 'endless variations in the facts and circumstances' implicating the Fourth Amendment." *Robinette,* 519 U.S. at 39, 117 S.Ct. 417 (quoting *Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

■ Officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *United States v. Estrada,* 459 F.3d 627, 632 (5th Cir.2006) (quoting *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)); *see also United States v. Grant,* 349 F.3d 192, 197 (5th Cir.2003). Courts should err on the side of deferring to the knowledge and experience of trained law enforcement officers to distinguish between innocent and suspicious activities. *See United States v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Nonetheless, Fourth Amendment activities are to be judged in the light of objectively justifiable factors, not a law enforcement officer's subjective motives. *See, e.g., Saucier v. Katz,* 533 U.S. 194, 210, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Therefore, the officers involved must be able to articulate something more than just an unparticularized or inchoate hunch. *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Estrada,* 459 F.3d at 631.

■ Although the showing required to demonstrate reasonable suspicion is considerably less than what is necessary to establish probable cause, the Fourth Amendment, measured in the light of the totality of the circumstances, requires some minimal level of objective justification for an officer's actions. *United States v. Rideau,* 969 F.2d 1572, 1574 (5th Cir. 1992) (citing *Sokolow,* 490 U.S. at 6–8, 109 S.Ct. 1581). An analysis of the reasonableness of factors, which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion. *United States v. Ibarra–Sanchez,*

199 F.3d 753, 759 (5th Cir.1999). Courts should look at the totality of the circumstances to discern whether the officers involved were presented with a "particularized and objective basis" for the suspected wrongdoing. *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744. The Supreme Court instructs lower courts not to treat each factor in isolation but, rather, to give due regard to the totality of the circumstances. *Lopez–Moreno,* 420 F.3d at 433.

Here, Smith initiated his emergency lights and validly stopped the Chevrolet Monte Carlo at 9:47 p.m. The videotape of the traffic stop shows that Smith approached the passenger side of the vehicle and made contact with the occupants at 9:48 p.m. During this initial contact, Smith testified that he requested and obtained a driver's license from Alexander and Walker as well as proof of insurance from the driver, Alexander. The videotape also shows that Smith explained the reason for the stop and conversed briefly with the occupants. He asked Alexander where they were headed and how long they planned to stay. After observing a student identification card, he inquired whether Walker was currently enrolled in school. This initial encounter lasted less than two minutes. Hence, Smith's initial contact, requests, and inquiries were constitutional. *See Lopez–Moreno,* 420 F.3d at 430; *Brigham,* 382 F.3d at 507–08.

At 9:50 p.m., Smith returned to his patrol car and radioed for warrant checks, also legally permissible. *See Lopez–Moreno,* 420 F.3d at 430; *Brigham,* 382 F.3d at 507–08. The results of the warrant checks, which revealed that neither occupant of the vehicle had outstanding warrants, were radioed back to Smith at 9:53 p.m. Alexander maintains that it was at this time that he should have been allowed to leave, as the purpose of the traffic stop had been fulfilled. Smith candidly admitted that at 9:53 p.m., when the warrant

checks returned, the "initial traffic stop which is the no light on the license plate was over...." Further, he conceded that he originally planned to issue a warning, rather than a citation, for Alexander's Class C misdemeanor violation and that "they should be on their way." At 9:53 p.m., however, Smith approached the driver's side of the Monte Carlo and asked Alexander to exit and step to the rear of the vehicle. Thus, the question before the court is whether reasonable suspicion, justifying further detention, arose during the approximate six minutes that elapsed from the time Smith stopped the vehicle to the time the warrant search was completed. *See Jenson,* 462 F.3d at 404; *Magana,* 544 F.Supp.2d at 566.

Alexander asserts that Smith failed to develop articulable reasonable suspicion that would permit such a continued detention. The government, however, contends that "Smith had reasonable suspicion, essentially from the time he approached the vehicle ...," and points to the following factors in support of its claims: (1) nervousness of the defendant and the passenger, (2) placement of multiple air fresheners about the interior of the vehicle, and (3) a single key in the ignition. It also argues that Smith's actions were responses to emerging facts, which were constitutionally valid and ultimately led to his request for consent to search the vehicle.

 Smith, the sole witness at the suppression hearing, testified regarding Alexander's and Walker's nervous behavior and demeanor. Specifically, Smith observed that both individuals avoided any kind of eye contact with him and that Alexander appeared to be shaking as he handed over his license. Additionally, he stated that Walker was breathing heavily and his carotid artery was pulsating. Case law in this circuit indicates that nervousness, standing alone, is insufficient to sup-

port reasonable suspicion of illegal drug trafficking. *Santiago*, 310 F.3d at 342; *see also Jenson*, 462 F.3d at 404–06. Nervousness, however, is still a relevant factor that the court should consider when evaluating the totality of the circumstances. *See Brigham*, 382 F.3d at 504 (finding that "increasing suspicion was fueled by … extreme nervousness, [and] his avoidance of eye contact"); *United States v. Henry*, 372 F.3d 714, 715–16 (5th Cir.2004) (considering nervousness as a factor in finding reasonable suspicion); *Grant*, 349 F.3d at 198 (taking into account the appearance of nervousness as a factor in creating reasonable suspicion). Likewise, eye contact may be considered when evaluating reasonable suspicion; it, too, is simply one factor that should be considered when evaluating overall behavior. *Brigham*, 382 F.3d at 508; *United States v. Sanchez*, 225 Fed.Appx. 288, 290 (5th Cir.2007) (considering eye contact as one of several factors in finding reasonable suspicion during a traffic stop). "However, '[r]easonable suspicion should not turn on the ophthalmological reactions of appellant.'" *United States v. Jackson*, 517 F.Supp.2d 859, 869 (W.D.La.2007) (quoting *United States v. Aldaco*, 168 F.3d 148, 152 (5th Cir.1999)).

 Smith also testified that during his two-minute exchange from the passenger side of the vehicle, he noticed several air fresheners strung about the interior. He stated that he observed them on the emergency brake pedal, the rear view mirror, the dashboard, and the window. He also noticed a few unopened packets on the floorboard. According to Smith, the presence of multiple air fresheners in a car can be an indicator of criminal activity because they have the ability to mask the odor of hidden contraband, such as narcotics. The existence of air fresheners alone, however, is insufficient to support reasonable suspicion, as there are a number of legitimate uses for air fresheners in automobiles. *See People v. Roa*, 377 Ill.App.3d 190, 316

Ill.Dec. 299, 879 N.E.2d 366, 380–81 (2007). Nevertheless, the use of air fresheners and other attempts to mask the odor of narcotics, coupled with other indicia of criminal activity, may give rise to reasonable suspicion necessary to support a brief inquiry by law enforcement. *United States v. Branch*, 537 F.3d 328, 338–39, 339–40 (4th Cir.2008) (relying on the presence of several air fresheners as one of the factors adding up to reasonable suspicion); *United States v. Goss*, 256 Fed.Appx. 122, 124–25 (9th Cir.2007) (finding that numerous, strangely placed air fresheners, along with other factors, gave rise to reasonable suspicion); *United States v. West*, 219 F.3d 1171, 1178–79 (10th Cir.2000) (noting that "[t]he Tenth Circuit has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis"). Here, the court finds Smith's explanation to be credible and considers the presence of numerous air fresheners, along with the scent they emit, as factors properly considered in a reasonable suspicion analysis.

Smith also testified that the presence of a single key in the ignition contributed to his assessment of reasonable suspicion. He explained that a single key

> normally signifies that it's not their car. Most people will take their car key off because they don't want their house key or anything else if it's not their vehicle and they'll give it to the driver or occupants of the vehicle so they can drive that car and don't have any other keys but the automobile key.

The government further clarified that "drug traffickers tend to borrow vehicles to traffic their drugs." While this factor may not be sufficient when viewed separately, the court is mindful that when considering the factors in a reasonable suspicion analysis, a court should look to the totality of the circumstances to see how

convincingly the factors fit into a cohesive picture of illegal conduct. *Arvizu,* 534 U.S. at 274, 122 S.Ct. 744. "[R]easonable suspicion may exist even if each observation is susceptible to an innocent explanation." *Magana,* 544 F.Supp.2d at 572 (quoting *United States v. Guerrero,* 472 F.3d 784, 787 (10th Cir.2007)).

In the instant case, Smith was presented with a visibly nervous driver and passenger, numerous air fresheners, and a single key in the ignition. The court also does not discount Smith's knowledge and experience gleaned from his employment as a DPS trooper.

> Drug couriers do not intentionally post clues or travel the interstate with destination and purpose signs displayed like Greyhound buses. Instead, drug couriers deliberately camouflage their illegal conduct in the guise of innocent activities to avoid apprehension. Meaningless minutiae that might go unnoticed by most civilians become the focus of a trained drug interdiction officer, leading to justification for further action. This is the benefit of police training and experience.

*Roa,* 316 Ill.Dec. 299, 879 N.E.2d at 375. In the aggregate, the court is of the opinion that Smith had reasonable, articulable suspicion based on a totality of the circumstances. This conclusion is further buttressed by Smith's musings to himself voiced on the videotape while awaiting the results of the warrant check. He is clearly perplexed as to why Alexander, from Texarkana, Arkansas, and Walker, from Little Rock, would be traveling just north of Dallas on Interstate 35 to reach Oklahoma City when a far shorter, more direct route was available. Smith, audible on the videotape, stated that it "don't make sense." Thus, Smith had ample reason to detain the occupants for a relatively brief period of time to investigate further in order to confirm or dispel his suspicions of criminal activity. *See Jenson,* 462 F.3d at 404; *Magana,* 544 F.Supp.2d at 566.

At 9:53 p.m., Smith separated the occupants to inquire about their travel itinerary. Over the course of a few minutes, Smith received conflicting stories. Alexander claimed that they had left Arkansas several days prior to the stop, while Walker stated that they had left that morning. Alexander also told Smith that they had stopped at least two times, including a visit to an uncle in Hickory Creek, Texas, which conflicted with Walker's assertion that they had been traveling without stopping. Smith found Walker's non-stop theory particularly troubling. First, he remarked

> if they had actually left that morning and like he said and made no stops it would have made no sense to travel from Little Rock to Dallas then go back up north it was just a way out of the way. They probably travelled twice the length they would have instead of going from Little Rock to Oklahoma City.

Second, he stated it would be "a long drive to not stop anywhere and eat." These questions and Defendants' inconsistent answers increased Smith's reasonable suspicion of criminal activity. Therefore, because Smith continued to investigate the escalating reasonable suspicion that arose during the course of the legal stop, the court concludes that he was constitutionally permitted to detain the occupants and investigate further, culminating in a request for consent to search the vehicle. *See Jenson,* 462 F.3d at 404; *Magana,* 544 F.Supp.2d at 566.

C. *Whether Defendant's Consent to Search the Vehicle was Validly Given*

■ The government argues that even if Smith unreasonably extended the traffic stop, Alexander's consent to search the vehicle could cure any Fourth Amendment problem. *See Jenson,* 462 F.3d at 406.

"Consent to search may, but does not necessarily, dissipate the taint of a [F]ourth [A]mendment violation." *Id.* (quoting *United States v. Chavez–Villarreal,* 3 F.3d 124, 127 (5th Cir.1993)); *Brigham,* 382 F.3d at 508 (noting that "a consensual interrogation may follow the end of a valid traffic stop"). In any event, "[i]n situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Thus, the court must evaluate the validity of Alexander's consent to search the vehicle.

In assessing the validity of the consent, the court must consider: "(1) whether consent was voluntary and (2) whether it was an independent act of free will." *Jenson,* 462 F.3d at 406; *see also United States v. Gomez–Moreno,* 479 F.3d 350, 357 (5th Cir.2007). The court, in determining the voluntariness of consent, utilizes the following multi-factor test announced by the Fifth Circuit:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Jenson,* 462 F.3d at 406 (quoting *Jones,* 234 F.3d at 242). The burden of proving that consent was voluntary rests with the government. *Id.* Although all factors are relevant, none is individually dispositive. *United States v. Arias–Robles,* 477 F.3d 245, 248 (5th Cir.2007).

As to the first factor, it is undisputed that Alexander was never free to leave during the traffic stop. Smith retained possession of Alexander's driver's license and testified during cross-examination that Alexander was not free to leave.[3] *See Dortch,* 199 F.3d at 202 (noting that the fact that an officer had not returned the defendant's license and rental papers was a relevant factor as to the voluntariness of the consent). Therefore, this factor weighs in favor of the defendant.

With regard to the second and third factors, there is no indication that Smith employed any coercive police tactics. Smith was permitted to request and obtain a driver's license, proof of insurance, and vehicle registration at the outset of the stop. *See Lopez–Moreno,* 420 F.3d at 430; *Brigham,* 382 F.3d at 507–08. Likewise, Smith was entitled to inquire briefly about the defendant's travel plans or other questions unrelated to the purpose of the initial traffic stop. *Lopez–Moreno,* 420 F.3d at 430–31. Throughout the encounter, the videotape reveals that Smith was polite and courteous, he never drew a weapon, and he permitted Alexander to retrieve a jacket from the interior of the vehicle and to smoke a cigarette. There was no assemblage of a large number of officers that might have suggested to Alexander that Smith was contemplating an undertaking that did not depend upon his cooperation. No testimony or other evidence suggests

---

**3.** At the hearing, Smith responded as follows to defense counsel's interrogation:

> Q: So the initial traffic stop investigation is over now you feel that you've moved on to something else at that point?
>
> A: Yes, ma'am. I believe I had reasonable suspicion to continue the investigation.
>
> Q: And at that point Mr. Alexander was not free to leave?
>
> A: No, ma'am.
>
> Q: If he said I want to go, give me my warning, you would have—well you would have stopped him; is that correct?
>
> A: Yes, ma'am.

that Smith or Alexander raised their voices, that Alexander was threatened or intimidated, or that Smith made repetitive requests for consent after an initial refusal. Instead, the videotape corroborates Smith's testimony that Alexander was quite cooperative, obeyed his requests, and answered his questions. When asked about any firearms in the car, Alexander accurately described the location of a gun wedged between the driver's seat and the center console. He also detailed his previous traffic citations. Additionally, Alexander was not detained for an extended period of time—less than twenty minutes elapsed from the time Smith initiated his emergency lights until consent was given. Smith discovered the contraband approximately ten minutes later, after which he arrested Alexander and Walker. Accordingly, these factors weigh in favor of the government.

The record is devoid of any evidence that Alexander was aware of his right to refuse consent. Awareness of such a right, however, is not fatal to establishing that consent was voluntary. *See Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."). Nevertheless, Alexander's actions and responses during the traffic stop do not indicate that he lacked the education or sufficient intelligence to understand that he was giving Smith consent to search the vehicle. As mentioned above, Alexander obeyed Smith's requests and answered his questions. The videotape demonstrates that Alexander was able to understand and communicate effectively with Smith without any apparent difficulties. While the record lacks detailed information regarding Alexander's formal education level, he reported to pre-trial services that he graduated from high school in 2000 and subsequently served in the military for several years. There is no suggestion that his intellect or comprehension was diminished or impaired on the evening in question, which would preclude him from understanding Smith's request. The videotape reflects that the following exchange ensued between Smith and Alexander regarding the contents of the automobile:

SMITH: Do you have any guns in the vehicle?

ALEXANDER: I got a pistol.

SMITH: Where's it at?

ALEXANDER: My firearm [Inaudible] right beside my seat. I just stopped for ... I just stopped for....

SMITH: You got a [Inaudible] for that? Is it loaded?

ALEXANDER: Uh.

SMITH: [Inaudible] guns or weapons in the vehicle?

ALEXANDER: Nope. My firearm is the only firearm in the vehicle. And I usually keep it locked up and I pulled it out when I went to get gas.

SMITH: Is it registered to you?

ALEXANDER: Yes it is. Yes it is.

SMITH: You have no ... uh ... stolen property in the vehicle?

ALEXANDER: No sir.

SMITH: No guns? No drugs?

ALEXANDER: No sir.

SMITH: You have nothing other in that vehicle that would be considered contraband—guns, drugs, alligator skin, nothing like that? And I'm not assumption that you have nothing in the vehicle; you don't mind if I search your vehicle ...

ALEXANDER: No sir.

SMITH: for those items?

ALEXANDER: No sir.

SMITH: Okay.

ALEXANDER: Like I said, the only thing in there is a pistol. I can show you exactly where it is. And . . .

SMITH: I'll get it. I'll get it. I'll get it. That's no problem.

Accordingly, this factor weighs in favor of the government.

With regard to the final factor, the controlled substances seized from the vehicle in this case were stored within two false compartments equipped with locking mechanisms. Smith testified that the compartments were concealed behind decorative panels within the rear passenger area of the vehicle, which were not readily apparent but for a difference in dust accumulation. It was reasonable, therefore, for Alexander to believe that no incriminating evidence would be found as a result of the search. This factor, likewise, weighs in favor of the government.

Having considered all the factors, carefully viewed the videotape, and examined the totality of the circumstances, the court concludes that Alexander's consent to search the vehicle was voluntarily and freely given.

III. *Conclusion*

For the reasons stated above, the court concludes that the government has met its burden of proving by a preponderance of the evidence that the traffic stop in question was initiated upon probable cause and that the subsequent search of the vehicle and the seizure of all evidence, both physical and testimonial, comported with the dictates of the Fourth Amendment. Accordingly, Alexander's Motion to Suppress to Evidence and Statements is DENIED.